## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LEAH WHITE,<br><br>                    Plaintiff,<br><br>v.<br><br>PAYPAL HOLDINGS, INC. and HONEY, aka, THE HONEY SCIENCE CORPORATION,<br><br>                    Defendant. | **Case No.**   3:25-cv-46<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Leah White ("Plaintiff"), individually and on behalf of all other members of the below-defined class (the "Class"), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by her attorneys, alleges as follows:

## <u>INTRODUCTION</u>

1.     This case involves PayPal's browser extension, Honey, that misleadingly purported to find consumers the best coupon codes available.  Instead, the browser extension prioritized codes from partner merchants over better deals existing in the market, resulting in users receiving either inferior discounts or no discounts at all.

2.     Moreover, PayPal used a highly effective strategy to systematically divert affiliate marketing commissions from content creators who have established their livelihoods through online businesses, personal branding, and advertising partnerships, to PayPal via the Honey extension.

3.     In March 2020, PayPal purchased a popular web browser extension called Honey for $4 billion. At the time of PayPal's 2020 purchase of Honey, PayPal had approximately 300 million active users, and Honey had approximately 17 million active users.[1] Recent estimates have found that Honey is installed on more than 20 million Google Chrome web browsers alone, making it the twelfth most popular extension for the Chrome browser.[2] As one technology blog described it at the time, PayPal's purchase of Honey was "PayPal's largest to date [and] will give the payments giant a foothold earlier in the customer's shopping journey. Instead of only competing on the checkout page against credit cards or Apple Pay, for example, PayPal will leap ahead to become a part of the deal discovery process as well."

4.     The Honey extension—popularized through its advertising relationship with popular social media stars—claims to help customers find and apply promotional codes at checkout for participating merchants and to reward users with cash back or gift cards for their purchases.

---

[1] PayPal to Acquire Honey, PayPal Newsroom (Nov. 20, 2019), https://newsroom.paypal-corp.com/2019-11-20-PayPal-to-Acquire-Honey.
[2] Matt Zeunert, Chrome Extension Statistics: Data from 2024, DebugBear (Aug. 29, 2024), https://www.debugbear.com/blog/chrome-extension-statistics.

5. When a customer who has installed Honey is about to purchase a product, they can use Honey to search for coupons. Since it is a web browser extension, Honey is always visible to the user on the task bar at the top of the user's web browsing page. If there are coupons, the coupons will be applied.[3]

6. While there has existed some speculation regarding how Honey makes money—it was mysterious to many how a browser extension that was free to install and that searched for free-to-use coupons was profitable, much less worth $4 billion—Honey claims on its webpage to make money through "commissions from…merchant partners."[4]

7. As described fully below, Defendants failed to disclose to Plaintiff and Class Members that Honey's business is built around stealing commissions from affiliate marketers and misleading consumers into believing they are receiving the best deals on the internet when, in fact, they are not.

8. When a user uses Honey to search for coupons, Honey replaces the referral link cookie with its own, effectively taking full credit and any resulting commission from the sale—commission that should have rightfully gone to the affiliate marketer whose referral link was used. Honey does this even where it has not found a coupon for the user at all—the simple act of clicking a button affiliated

---

[3] Sarah Perez, PayPal to acquire shopping and rewards platform Honey for $4B, TechCrunch (Nov. 20, 2019), https://techcrunch.com/2019/11/20/paypal-to-acquire-shopping-and-rewards-platform-honey-for-4-billion/.
[4] How does Honey make money?, PayPal Honey (Nov. 25, 2024), https://help.joinhoney.com/article/30-how-does-honey-make-money.

with Honey will cause Honey to place its own affiliate marketing cookie in the place of the affiliate marketer cookie that actually led the user to the purchase. PayPal also has created a program of "PayPal Rewards" which, if activated at checkout, will replace  the affiliate marketer's cookie with PayPal's.

9.     Moreover, rather than finding Plaintiff and Class Members the best coupons codes available, as advertised, Honey prioritized codes from partner merchants over better deals existing in the market, resulting in profits for Honey at the expense of consumers like Plaintiff.

10.     Plaintiff, individually and on behalf of the other Class members, accordingly files this claim for damages and injunctive relief, seeking an immediate end to PayPal's abusive practices and for recompense for the harm that has already been done.

## PARTIES

11.     Plaintiff Leah White is a citizen of Florida and, at all relevant times, has been a resident of Pensacola, Florida. She is a consumer who downloaded and used Honey to find the best coupon codes available on online purchases.

12.     Defendant PayPal Holdings, Inc. is a Delaware corporation and holds all assets and liabilities of PayPal, Inc., a subsidiary Delaware corporation. PayPal transacts business in this district and is headquartered at 2211 North First Street, San Jose, California 95131. The two entities are collectively referred to as "PayPal."

4

13.     In addition, PayPal owns and operates Honey, aka the Honey Science Corporation, which had originally developed the Honey browser extension. Honey was purchased by PayPal in 2020. The term "PayPal" shall encompass Honey, unless otherwise noted.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class is a citizen of a state different from Defendants.

15.     This Court has personal jurisdiction over Defendants because they conduct substantial business in this District, have purposefully availed themselves of the benefits and privileges of conducting business in this District, are headquartered in the district, and have caused harm to Plaintiff and class members as a direct result of actions they take in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### *Honey Browser Extension*

17.    The Honey browser extension is an add-on compatible with nearly every major web browser. Adding it to the web browser is simple: for example, a user of the popular Google Chrome browser need only click "Add to Chrome," and the extension will be added:



18.    Once added, Honey becomes an "extension" of the browser, meaning that it can add/change information for the user—e.g., install cookies or so-called "tracking tags" on the website.

19.    When a user shops, the Honey extension will automatically search for and apply coupons.

20.    While Honey is purportedly providing users with "free" coupons, it is doing so at the expense of Affiliate Marketers.

### *Honey Misleads Consumers*

21.    Honey falsely and misleadingly claims to find the "best available coupon codes" for consumers like Plaintiff and Class Members.

22.    Honey's website currently represents that it will find users "the Internet's best discount codes."[5]



23.    It also states that it "search[es] for the internet's best coupons" and helps consumers "find coupon codes on 30,000+ sites."[6]

[5]https://www.joinhoney.com/betterprice/?from=r&utm_campaign=AFFI_US_CJ_100084481_15187887_Skimlinks&utm_source=AFFI&cjevent=1f51e01bdf2311ef80aa15050a82b832, last accessed Jan. 30, 2025.
[6] https://www.joinhoney.com/, last accessed Jan. 29, 2025.



24.    In reality, contrary to its representations to consumers, a recent expose revealed that Honey's scheme prioritizes coupon codes from partner merchants over better deals that exist elsewhere on the marketplace and, in some cases, excludes non-partner coupons from its searches.[7]

25.    As a result of this false and misleading advertising, consumers who use Honey often receive inferior discounts, or no discounts at all, while Honey and its retail partners profit.

---

[7] MegaLag, Exposing The Honey Influencer Scam (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk.

26.     Consumers are also disincentivized from searching on their own for additional coupon codes, as they are left with the impression from Honey's advertising that its coupon code search is comprehensive.

27.     In 2020, Honey was investigated by the Better Business Bureau National Advertising Division (NAD) for claiming it could find "every working code on the internet."[8]

28.     NAD found that Honey's express claim that "With just a single click, Honey will find every working code on the internet and apply the best one to your cart" implied the following claims:

> a.  Without exception, Honey offers its users access to every single working promo code that is available on the internet - including codes offered on an exclusive basis by RetailMeNot.com or other online businesses; and
>
> b.  Because Honey provides users with access to every working promo code on the internet, consumers need never look elsewhere to find separate, relevant codes.[9]

---

[8] https://bbbprograms.org/media-center/dd/nad-honey-science-coupon-claims, last accessed Jan. 30, 2025.
[9] *Id.*

29.     Honey informed the NAD that, prior to the opening of NAD's inquiry, it was in the process of discontinuing the express and implied claims brought in this challenge for business reasons.[10]

30.     Honey agreed to permanently discontinue the challenged claims and, relying on those representations, NAD did not review the claims on the merits.[11]

31.     In reality, those statements are still available on Honey's website, where it purports to "find every working promo code on the internet" and "apply the best deal" to consumers' carts.[12]



32.     Even when no coupon codes are found, Honey still takes credit for sales by inserting itself into the transaction process. This misleads users into believing they are receiving benefits from the extension.

---

[10] *Id.*

[11] *Id.*

[12] https://www.joinhoney.com/betterprice/?from=r&utm_campaign=AFFI_US_CJ_100084481_15187887_Skimlinks&utm_source=AFFI&cjevent=1f51e01bdf2311ef80aa15050a82b832, last accessed Jan. 30, 2025.

33.    Honey's business model prioritizes its own profits and those of its business partnersh over providing genuine value to consumers, misleading millions of users about the true nature and effectiveness of its service.

***Honey Steals from Affiliate Marketers.***

34.    Affiliate marketing is a form of online advertising where content creators such as YouTubers, influencers, and bloggers (hereinafter, "Affiliate Marketers") promote products or services of e-commerce merchants, such as online retailers (hereinafter, "Merchants") and receive a commission for each sale generated through their referral links.

35.    Commissions are linked to Affiliate Marketers via a "cookie" embedded in referral links.

36.    According to one estimate, in 2023 referral marketing spending in the United States alone was approximately $9.56 billion, with likely spending of up to 15.8 billion by 2028.

37.    Sales attributable to Affiliate Marketers are typically tracked through affiliate marketing cookies and/or tracking links. A cookie is a small text file that tracks a user's activity after clicking an affiliate marketer's link. The cookie stores information about the referring affiliate marketer—e.g., the influencer—and is used to determine whether a user makes a purchase. If the user does, the affiliate marketer typically receives a commission.

38.    A recent expose revealed Honey's scheme to divert commission to PayPal that otherwise should have been going to Affiliate Marketers.[13] Using what is often referred to as the "developer mode" of a web browser, the investigation studied network traffic for browsers with a Honey extension installed, and followed, click by click, as Honey stole an affiliate marketer's cookie.

39.    Honey uses two strategies to steal Affiliate Marketers' referrals. First, by Honey's design, if a user uses Honey to search for a coupon, Honey treats that search as authorization to overwrite an affiliate marketer's cookie. In one example, an investigator navigated to a popular YouTuber's website and clicked on the YouTuber's affiliate link to an item for sale.

40.    The investigator was then redirected to a Merchant page where the item was being sold, and in the URL there appeared a "tracking tag" labeled with the YouTuber's channel so that the YouTuber would receive commission. The tracking tag was also saved on the investigator's

41.    The investigator, however, had purposefully installed Honey on the browser he was using. When he used Honey to check for discounts, he noted that the YouTuber's cookie had been replaced with Honey's PayPal cookie:

---

[13] MegaLag, Exposing The Honey Influencer Scam (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk.

42.    As a result, instead of the YouTuber being paid a commission, PayPal would get the entirety of the commission.

43.    The investigator revealed that this cookie theft would occur even if Honey did not find any discounts for the product sought.

44.    The investigator reached out directly to PayPal and asked whether Honey was replacing cookies from Affiliate Marketers with its own cookie. PayPal admitted that it is, responding: "If Honey is activated and is the last program used while shopping on a site, it is likely Honey will receive credit for the purchase."

45.    Next, Honey uses a purported Rewards program to fight for the "last click attribution," the term of art for the affiliate marketer who should be credited with a customer's purchase (i.e., the marketer who inspired the "last click" that led to the sale).

46.    Now called PayPal Rewards (formerly Honey Gold), PayPal has partnered with what it claims to be approximately 1500 retailers to allow users to get "PayPal Rewards Points" when they make purchases.

47.    Even when there are no coupons, Honey will sometimes provide the user with "cash back" in the form of PayPal points.

48.    Activating the PayPal Rewards will lead to the replacement of an affiliate marketer's link with a PayPal link, again allowing PayPal to poach an Affiliate Marketer's commission.

49.  Plaintiff alleges the following facts with particularity:

a.  **WHO**: Defendants made false statements and material misrepresentations and/or omissions of fact.

b.  **WHAT**: Defendants made the following misrepresentations and/or omissions of fact, which led Plaintiff to believe that (1) Without exception, Honey offers its users access to every single working promo code that is available on the internet; and (2) Because Honey provides users with access to every working promo code on the internet, consumers need never look elsewhere to find separate, relevant codes Honey:

  i.  "Honey finds you the Internet's best discount codes;"

  ii.  "We search for the internet's best coupons;"

  iii.  Honey will find every working promo code on the internet;" and

  iv.  "With one click, Honey will apply the best deal to your card."

c.  **WHEN**: Defendants made material misrepresentations, false statements and/or omissions both prior to and at the time Plaintiff used Honey.

d.  **WHERE**: Defendants made material misrepresentations, false statements and/or omissions online on Honey's website.

e. **HOW**: Defendants made material misrepresentations, false statements and/or omissions online on Honey's website.

f. **WHY**: Defendants made the material misrepresentations, false statements, and/or omissions detailed herein for the express purpose of inducing Plaintiff and Class Members to either decide as a new user to use Honey or decide as an existing user to continue using the Honey.

g. **INJURY**: But for Defendants' wrongful acts, Plaintiff would not have used Honey exclusively and, instead, would have either not used Honey or would have searched for additional discount codes or coupons available for online purchases. As a result, Plaintiff suffered economic loss.

## CLASS ACTION ALLEGATIONS

50.    Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

51.    The Classes that Plaintiffs seek to represent are defined as follows:

**Nationwide Class**

All U.S. consumers who used the Honey browser extension (the "Class").

**Florida Subclass**

All Florida consumers who used the Honey browser extension (the "Florida

Subclass").

Collectively, the Class and Florida Subclass are referred to as the "Classes" or "Class

Members."

52.     Excluded from the Classes are the following individuals and/or entities:

Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors,

and any entity in which Defendants has a controlling interest; all individuals who

make a timely election to be excluded from this proceeding using the correct protocol

for opting out; and all judges assigned to hear any aspect of this litigation, as well as

their immediate family members.

53.     Plaintiff reserves the right to amend the definitions of the Classes or

add a Class or Subclass if further information and discovery indicate that the

definitions of the Classes should be narrowed, expanded, or otherwise modified.

54.     Numerosity: The members of the Classes are so numerous that joinder

of all members is impracticable, if not completely impossible. The members of the

Classes are so numerous that joinder of all of them is impracticable. While the exact

number of Class Members is unknown to Plaintiff at this time and such number is

exclusively in the possession of Defendant, upon information and belief, millions of

minor individuals are implicated.

55.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

a.    Whether PayPal's Honey browser extension was knowingly designed to replace the cookies of Class members with PayPal cookies;

b.    Whether PayPal's Honey browser extension in fact replaced the cookies of Class members with PayPal cookies;

c.    Whether as a result of PayPal's actions PayPal has been awarded commissions that rightfully should belong to members of the Class;

d.    Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, punitive damages, exemplary damages, and/or other relief;

e.    Whether PayPal has been unjustly enriched to the detriment of Class members; and

f.    Whether Plaintiff and the other Class members are entitled to declaratory, injunctive, or monetary relief, and if so, in what amount and form.

56.    Typicality: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, were exposed to

virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

57.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

58.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

59.    Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient

adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

60. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

61.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

62.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

63.    Unless a Class-wide injunction is issued, Defendants may continue to act unlawfully as set forth in this Complaint.

64.    Further, Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA) F.S. §§501.201 et seq.
### (*On behalf of Plaintiff and the Florida Subclass v. All Defendants*)

65.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

66.    Plaintiff brings this Count individually and on behalf of the Florida Subclass.

67.    Plaintiff and members of the Florida Subclass are residents of Florida.

68.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, Fla. Stat.

69.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

70.    Defendant's actions are deceptive and in clear violation of FDUPTA, entitling Plaintiffs and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201- 213.

71.    Defendant engaged in "trade" or "commerce" in Florida in that Defendant engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Florida.

72.    Defendant engaged in consumer-oriented acts through the offer, promotion, and/or distribution of Honey, which significantly impacted the public because Honey is used nationwide, including in Florida, and there are millions of users, including Plaintiffs and members of the Florida Subclass.

73.    Defendant has engaged in acts and practices that are false and deceptive in violation of FDUTPA.

74.    Defendant's business acts and practices are unlawful because they unconscionably, falsely, or deceptively induce customers into believing they are receiving the best deals available on the internet by using the Honey Browser when, in reality, they often are not.

75.    Instead, the browser extension prioritized codes from partner merchants over better deals existing in the market, resulting in users receiving either inferior discounts or no discounts at all, directly harming Plaintiff and other Class members.

76.    Defendant has unjustly enriched itself for the reasons stated above.

77.    Defendant committed unconscionable, false, and deceptive business practices by making false and misleading representations regarding the browser extension.

78.    Defendant wrongfully deprived, and continues to deprive, Plaintiff and other Florida Subclass members of monies they otherwise would have saved by using other methods to search for, and find, better coupon codes.

79.    But for Defendants' wrongful acts, Plaintiff would not have used Honey exclusively and, instead, would have either not used Honey or would have searched for additional discount codes or coupons available for online purchases.

80.    The gravity of harm resulting from PayPal's practices outweighs any potential utility therefrom.

81.    Defendant's conduct as set forth in this Complaint violates public policy and is an insidious, unconscionable injury.

82.    As outlined herein, Defendants at all times had actual knowledge of their wrongful conduct.

83.    Defendants has engaged, and continues to engage, in conduct that is likely to deceive members of the public.

84.    This information is important to consumers, including Plaintiff and the Florida Subclass members, because they were wrongfully deprived of monies they otherwise would have saved by using other methods to search for, and find, better coupon codes.

85.    Defendant's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.

86.    Plaintiff and members of the Florida Subclass could not have reasonably avoided injury because Defendants took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers, to the detriment of Plaintiff and the Florida Subclass members.

87.    Plaintiff and the Florida Subclass did not know of Defendant's wrongful scheme.

88.    Defendant willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Fla. Stat. Ann. § 501.204, et seq.

89.    Plaintiff and members of the Florida Subclass were harmed by Defendant's practices described herein, which were a substantial factor and caused injury in fact and actual damages to Plaintiffs and members of the Florida Subclass.

90.    As a direct and proximate result of Defendant's unfair and unlawful acts and practices in violation of Fla. Stat. Ann. § 501.204, et seq., Plaintiff and members of the Florida Subclass have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, *inter alia*, monies they otherwise would have saved by using other methods to search for, and find, better coupon codes, which allowed Defendants to profit at the expense of Plaintiffs and members of the Florida Subclass. Such an injury is not outweighed by any countervailing benefits to consumers or to competition.

91.    The conduct alleged herein is continuing and there is no indication that Defendant will cease such activity in the future, absent an order from this Court.

92.    Because Defendant's misconduct is ongoing and continuing, prospective injunctive relief is necessary. Absent injunctive relief, Defendants may continue their wrongful practices.

93.    Florida Statutes, Section 501.204, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

94.    Florida Statutes, Section 501.211, creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

95.    Florida Statutes, Section 501.2105, provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non-prevailing party.

96.    Florida Statutes, Section 501.213, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

97.    Plaintiff and members of the Florida Subclass seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Fla. Stat. Ann. § 501.204, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction.

98.    In accordance with FDUTPA, Plaintiffs and the Florida Subclass seek an order enjoining Defendants from continuing to conduct business through

unlawful acts and practices. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

99.    On behalf of Plaintiffs and the Florida Subclass, Plaintiffs also seek an order entitling them and the Florida Subclass to recover all monies which were acquired through Defendants' acts of fraudulent, unfair, or unlawful competition.

## COUNT II:
## Fraudulent Misrepresentation
### (On behalf of Plaintiff and the Classes v. All Defendants)

100.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

101.    Defendants made numerous misrepresentations of material facts to Plaintiffs and Class Members, including but not limited to:

  a.  "Honey finds you the Internet's best discount codes;"

  b.  "We search for the internet's best coupons;"

  c.  Honey will find every working promo code on the internet;" and

  d.  "With one click, Honey will apply the best deal to your card."

102.    Defendants had knowledge of their misrepresentations at the time.

103.    Defendants made such misrepresentations with the intention inducing confidence and driving consumers to use the Honey browser extension as their sole source of searching for discounts and coupons available for online purchases.

104.   Defendants intended that Plaintiffs and Class Members would act upon their misrepresentations by either deciding as a new user to use Honey or deciding as an existing user to continue using the Honey.

105.   Plaintiffs and Class Members were unaware of the falsity of the misrepresentations made by Defendants.

106.   Defendants' misrepresentations induced Plaintiffs and Class Members into using Honey.

107.   Plaintiffs and Class Members actually relied on Defendants' misrepresentations and omissions in deciding to use Honey and in deciding not to search for additional discount codes or coupons available for online purchase.

108.   But for Defendants' fraudulent misrepresentations, Plaintiff would not have used Honey exclusively and, instead, would have either not used Honey or would have searched for additional discount codes or coupons available for online purchases.

109.   Plaintiffs' and Class Members' reliance on Defendants' misrepresentations was reasonable.

110.   Plaintiffs' and Class Members' reliance on Defendants' misrepresentations resulted in damage to Plaintiffs and Class Members, including but not limited to being wrongfully deprived of monies they otherwise would have saved by using other methods to search for, and find, better coupon codes.

111.  Defendants are therefore jointly and severally liable for Plaintiffs' injuries.

## COUNT III:
### Fraudulent Concealment
### (*On behalf of Plaintiff and the Classes v. All Defendants*)

112.  Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

113.  Defendants concealed from Plaintiff and Class material facts, including that Honey prioritizes coupon codes from partner merchants over better deals that exist elsewhere on the marketplace and, in some cases, excludes non-partner coupons from its searches.

114.  Defendants had knowledge of the concealment of such material facts.

115.  Plaintiffs and Class Members were unaware of the falsity of the omissions and concealment of material facts made by Defendants.

116.  Defendants concealed such material facts with the intention of inducing confidence and driving consumers to use Honey.

117.  Defendants intended that Plaintiffs and Class Members would act upon their omissions by either deciding as a new user to use Honey or deciding as an existing user to continue using Honey.

118.   Plaintiffs and Class Members actually relied on Defendants' misrepresentations and omissions in deciding to use Honey and in deciding not to search for additional discount codes or coupons available for online purchase.

119.   But for Defendants' omissions, Plaintiff would not have used Honey exclusively and, instead, would have either not used Honey or would have searched for additional discount codes or coupons available for online purchases

120.   Plaintiffs' and Class Members' reliance on Defendants' misrepresentations and omissions was reasonable.

121.   Defendants' concealment resulted in damage to Plaintiffs and Class Members, including but not limited to being wrongfully deprived of monies they otherwise would have saved by using other methods to search for, and find, better coupon codes.

## COUNT IV:
## Unjust Enrichment
### (*On behalf of Plaintiff and the Classes v. All Defendants*)

122.   Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

123.   Plaintiff and other Class members lack a fully adequate remedy at law.

124.   Plaintiff and other Class members have an interest, both legal and equitable, in the monies they otherwise would have saved by using other methods to

search for, and find, better coupon codes, which was wrongfully taken by Defendants.

125.  Defendants have been unjustly enriched by the payments that they took when they wrongfully prioritized coupon codes from partner merchants over better deals that exist elsewhere on the marketplace and, in some cases, excluded non-partner coupons from its searches.

126.  Defendants continue to benefit from their wrongful behavior, and profit through their use of the Honey extension to the clear detriment of Plaintiff and other Class members.

127.  Defendants' wrongful acts are ongoing, continuing to harm members of the class while enriching Defendants.

128.  But for Defendants' wrongful acts, Plaintiff and other Class members would not have used Honey exclusively and, instead, would have either not used Honey or would have searched for additional discount codes or coupons available for online purchase.

129.  It would be inequitable for Defendants to retain the benefit of their wrongdoing.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class and Subclass members, respectfully requests that the Court:

A.    Certify this action as a class action, appoint Plaintiff as class representative, and appoint her counsel as Class Counsel;

B.    Declare that Defendants' conduct, as alleged herein, violates the laws of the states where Plaintiff and the other Class members reside;

C.    Enjoin Defendants from continuing or engaging in the unlawful conduct alleged, or cease, their deceptive practices;

D.    Award Plaintiff and the other Class members actual, statutory, treble, punitive, and consequential damages, in an amount to be determined at trial;

E.    Order Defendants to disgorge and/or restore all funds, revenues, and benefits obtained from Plaintiff and the other Class members as a result of their unlawful conduct;

F.    Award Plaintiff and the other Class members pre-judgment and post-judgment interest, as allowed by law;

G.    Award Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses, as allowed by law or equity; and

H.    Grant Plaintiff and the other Class members all other relief that the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

for all claims so triable.

Dated: January 30, 2025

/s/ Bryan F. Aylstock
Bryan F. Aylstock (Fla. Bar 78263)
D. Nicole Guntner (Fla. Bar 1028925)
**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email:  baylstock@awkolaw.com
        nguntner@awkolaw.com